The STANDARD STRUCTURAL STEEL CO.

v.

BETHLEHEM STEEL CORPORATION.

The STANDARD STRUCTURAL STEEL CO.

v.

LIBERTY MUTUAL INSURANCE COMPANY.

Civ. Nos. H–75–176, H–78–127.

United States District Court, D. Connecticut.

Oct. 26, 1984.

Frank DeNezzo, Schatz, Weinstein & Seltzer, Robert L. Trowbridge, Esq., Trowbridge, Goodman & Rosenthal, Hartford, Conn., for plaintiff.

John R. Fitzgerald, Howard, Kohn, Sprague & Fitzgerald, Hartford, Conn., for Liberty Mut. Ins. Co.

Thomas J. Groark, Jr., Day, Berry & Howard, Hartford, Conn., for Bethlehem Steel Corp.

## MEMORANDUM OF DECISION

CLARIE, Senior District Judge.

The plaintiff, The Standard Structural Steel Company ("Standard" or "the plain-

tiff") commenced two separate suits in an effort to recover the property damage and economic loss it allegedly suffered during May and June 1974, while performing a contract to dismantle the ironwork in the Gold Star Memorial Bridge at New London, Connecticut, and erect a new bridge to replace it. Standard initially brought suit against the defendant, Bethlehem Steel Corporation ("Bethlehem") in the Connecticut Superior Court, claiming that Bethlehem had breached its implied warranties of merchantability and fitness for a particular purpose in the sale of the "bridge strand" (lifting cable); and further, that Bethlehem was strictly liable in tort to Standard for having sold the plaintiff an unreasonably dangerous product. Bethlehem, an out-of-state defendant, then petitioned to remove this state court action to the federal court. Approximately three years later, the plaintiff decided to sue its own insurance carrier, the defendant Liberty Mutual Insurance Company ("Liberty") in this Court, invoking the principle of diversity jurisdiction. In the latter suit, Standard averred that Liberty had improperly failed to pay the plaintiff pursuant to its policy coverage for the May, 1974 incidents. On January 24, 1979, the two cases were consolidated for the purposes of trial; and thereafter, by agreement of the parties, the consolidated cases were bifurcated, and have been tried to the Court on the issue of liability alone.

The Court finds (1) that the bridge strand which Bethlehem sold to the plaintiff was not unreasonably dangerous so as to trigger strict liability in tort, (2) that Bethlehem successfully disclaimed both of the implied warranties alleged in the case, (3) assuming that the warranties had not been disclaimed, Bethlehem neither created a warranty of fitness for a particular purpose nor breached the warranty of merchantability, and (4) that the "CONTRACTORS' EQUIPMENT FORM (All Risk)"

policy issued to Standard by Liberty did cover the damage at issue in this case. The Court also finds that the defendant Bethlehem Steel Corporation is not liable in damages to the plaintiff for the May and/or June 1974 resulting damages which occurred in connection with the cable guide breaking at the weld, but finds the defendant Liberty Mutual Insurance Company liable to indemnify the plaintiff for the provable losses under the terms of the initial policy dated December 31, 1973. Due to the bifurcation of the issues, the exact amount of provable damages due and owing cannot be determined without a further hearing.

### Findings of Fact

The plaintiff Standard Structural Steel Company is a Connecticut corporation engaged in the business of fabricating and erecting structural steel. Its principal place of business is Newington, Connecticut. The defendant Bethlehem Steel Corporation is a Delaware corporation with its principal place of business in Bethlehem, Pennsylvania. The defendant Liberty Mutual Insurance Company is a Massachusetts corporation with its principal place of business in Boston, Massachusetts.

In early 1973, Standard contracted to remove the existing truss spans of the original Gold Star Memorial Bridge, which crosses the Thames River between New London and Groton, Connecticut, and to erect new steel spans. The latter were to be prefabricated on shore and placed upon the existing concrete piers. To protect certain of its property during the course of this dismantling project, Standard entered into an initial contract of insurance, specifically called a "CONTRACTORS' EQUIPMENT FORM (All Risk)" policy with Liberty, effective for the period from October 1, 1973 until October 1, 1974.[1]

---

**1.** Standard also contracted with Liberty for an "INSTALLATION RISKS FORM" policy; one which covered other property, namely, the steel to be purchased, delivered and installed into the new bridge span to be erected in place of the bridge being dismantled. *See infra,* n. 7. This

latter policy did have a specific exclusion provision which excluded coverage for "defective design". This provision was not in the CONTRACTORS' EQUIPMENT FORM policy which related only to the dismantling of the old bridge; had

To remove and replace the spans, the plaintiff chose to use a new and rather unique waterborne derrick system. After consulting many experts,[2] the plaintiff, under the direction of Joseph Bachta, Assistant to the President of Standard, designed and constructed an apparatus consisting of a jacking system suspended from four shear-leg (boom) derricks, which were themselves floated on barge bases placed on the north and south sides of the bridge to be dismantled. Each derrick included two shear legs, or booms. The two barge bases upon which the derrick systems sat included three individual barges which were firmly affixed and connected one to another. The north and south barges themselves were also connected, but the plaintiff left a space between them to accommodate a movable transportation barge. As the derrick system would remove a section of the existing span, that section would be lowered and placed in a balanced posture upon the transportation barge and floated upstream, where it was dismantled on the shore.

Standard rented the mechanical jacking system from the Elgood-Mayo Corporation of New York, which had used the system in previous projects. This jacking system included fixed spreader beams which were suspended from the derricks by "bridge strand" cables. Upper stationary grippers were bolted to these spreader beams. Lower grippers were bolted to a second, movable set of spreader beams. The upper and lower spreader beams were connected by a hydraulic cylinder, which was the actual jacking system. Above the top grippers were channels supported by stationary cables.

The grippers consisted of wedge shaped shoes which operationally engaged the steel lifting cable through air pressure and mechanical power. The air pressure initially activated and opened the grippers. The mechanical power, which was derived from the weight of the system being lowered, exerted pressure on the lifting cable. As such, the carrying capacity was realized from the friction between the wedges, which were constricted by the gripper housing, and the lifting cable. Therefore, during operation, the grippers often squeezed the lifting cable with intense pressure.

There were eight pairs of grippers in all: an upper and a lower gripper on each of the two shear legs positioned abroad each of the two barge bases. Each of these grippers, however, did not work at the same time. When the upper grippers were engaged, the lower grippers were disengaged, and the hydraulic jack moved the lower grippers up or down in relation to the cable. The lower grippers would then be engaged, and the upper grippers disengaged, to permit the jack to move the cable, and with it the suspended bridge span, would be moved up or down.

When Elgood-Mayo employed this jacking system on past projects, it had utilized $2\frac{3}{4}''$ diameter wire rope as the lifting cable. In fact, in early April, 1973, Elgood-Mayo offered $2\frac{3}{4}''$ wire rope to the plaintiff for use on this project. However, the plaintiff rejected this offer. Although the Elgood-Mayo wire rope would have been sufficient for the Gold Star job, the plaintiff wanted to upgrade its system by increasing its lifting capacity for future jobs. (Bachta, direct, November 2, 1982; Bachta, cross, November 4, 1982). As a result, in May, 1973, Joseph Bachta, the plaintiff's chief engineer, decided to purchase $3\frac{1}{2}''$ diameter wire rope for the system. (Bachta, direct, November 2, 1982; Plaintiff's Exhibit 11).

there been such terminology, the Court's decision would not have been the same.

**2.** In the course of designing and constructing this system, the plaintiff relied heavily upon expert consultants. These included Wolchuck and Mayrbaurl, structural experts; a Dr. Pense, of Lehigh University-Fritz Laboratory, an expert in chemical and physical analysis of steel; Elgood-Mayo, experts regarding the grippers employed in this system, and particularly its engineer, Donald Brennan; and marine experts who considered the floatation aspects of the system. The plaintiff allowed each of the experts consulted to review relevant drawings of the lifting system.

In pursuance of this product, Bachta asked Bethlehem's salesman John Bowles, who was the salesman normally assigned to Standard, for a price quote or bid for wire rope to be used as a lifting cable on the Gold Star Memorial Bridge project. Bowles told Bachta that he would call in Ronald Bergmark, another Bethlehem salesman. (Bowles, direct. December 1, 1982).

Although Bergmark customarily sold wire rope, he was not technically astute in the area. A high school graduate with one year of college education, Bergmark had begun work at Bethlehem as a mail boy and progressed to the occupation of salesman in 1968. His technical background in wire rope consisted of a two month refresher course on the manufacturing thereof given by his employer. (Bergmark, Tr. 2–3, 5).

On May 31, 1973, at the request of his employer, Bethlehem Steel, Bergmark made his first (and only) visit to the plaintiff's offices. There, he met with Joseph Bachta and Howard Shea, Bachta's assistant. Bergmark spoke with Bachta for only a short period of time, spending the majority of his time in discussion with Shea. During this time, Bergmark understood that he was pursuing a wire rope order. (Bachta, cross, November 4, 1982; Bergmark, Tr. 4–6, 17, 27).

Shea and/or Bachta explained to Bergmark that the plaintiff needed cable for a lifting system for fabricated steel. Standard's personnel showed Bergmark some schematic drawings of components of the system, but never showed Bergmark a diagram of the entire system. After this meeting, Bergmark understood that the plaintiff needed cable to be used as a stationary member of the lifting system along which moving grippers would travel. (Bergmark, Tr. 7, 9, 15–18, 49–50).

The plaintiff's personnel then informed Bergmark that they intended to use 3½″ diameter wire rope, but asked him whether or not there was a way to increase the breaking strength of the cable without increasing the diameter. The plaintiff's employees told Bergmark that if they were to use a cable with a larger diameter, the gripper shoes would have to be remachined. As a result of this conversation, Bergmark understood the plaintiff's primary concern to be how to obtain a greater breaking strength without increasing the cable diameter. (Bergmark, Tr. 8–10, 55–56; Bachta, direct, November 2, 1982).

After consulting Bethlehem product catalogs which he had brought with him, Bergmark suggested that the use of "bridge strand" might be an appropriate solution to the plaintiff's problems. This 3⅛″ "bridge strand" consisted of approximately 130 individual wires, and according to the catalogs, is stronger than wire rope for any given diameter. However wire rope, with many more individual wires, is more flexible than a comparable diameter of bridge strand. Due to his lack of technical expertise, Bergmark called Bethlehem's Wire Rope Engineer William Schwenke on the telephone to discuss the issue in greater detail. (Bergmark, Tr. 8; Bachta, direct, November 2, 1982).

First, Bergmark spoke to Schwenke, explaining the jacking system as he understood it, a system in which the cable would be used as a static member with the grippers moving along it. Next, for added clarity, Bergmark turned the telephone over to Shea who spoke directly to Schwenke concerning the matter at hand. (Bergmark, Tr. 9, 14).

After speaking to both of these men, Schwenke stated that assuming the application of the lifting cable to be static, "bridge strand" might be more appropriate because its larger outer wires would be more conducive to gripping, (Bergmark, Tr. 15, 20) and that bridge strand would also provide the plaintiff with the lifting capacities which the plaintiff desired. Otherwise, Schwenke made no recommendation concerning the suitability of the lifting cable. Schwenke specifically told Bergmark, who in turn informed the plaintiff's employees, that, in order for Bethlehem to make a recommendation concerning the lifting cable, its engineers would have to be given an opportuni-

ty to review the technical drawings of the lifting system. (Bergmark, Tr. 15, 26–27). This statement accorded with a long-standing Bethlehem Steel policy, i.e., that Bethlehem will only make a recommendation after all design factors—load, strength, bend, speed, etc.—are known and can be evaluated by its engineers. (Schwenke, Tr. 56–57).

After speaking with Schwenke, Bergmark asked to see the drawings of the system. The plaintiff, however, only allowed Bergmark to see a drawing which illustrated a cable guide diameter of some seventeen feet; the actual diameter or arc of the first cable guide used in the operational system was only approximately three feet. The plaintiff would not allow Bergmark to view any other drawings, as it considered this information to be confidential and a proprietary matter. (Bachta, cross, November 4, 1982; Bergmark, Tr. 24–25; Defendant's Exhibit 9; Plaintiff's Exhibit 21).

Bachta articulated another concern of Standard's to Bergmark during this sales visit, namely, the availability of the product. Bergmark told Bachta that bridge strand would be available many months sooner than wire rope. (Bachta, cross, November 4, 1982). As of this date, May 31, 1973, the plaintiff had not yet decided to use bridge strand. It was only at a future date that Bachta discussed prices of bridge strand with representatives of Bethlehem over the telephone. Moreover, at the meeting of May 31, 1973, Bachta did not discuss the terms and conditions of sale with Bergmark. (Bachta, cross, November 4, 1982, direct, November 16, 1982; Bergmark, Tr. 37, 40).

At some time during Bergmark's visit, Standard decided to use "bridge strand". This fact was evidenced in three ways. First, during a conversation with Bachta, which took place after Bergmark's visit, Bowles asked Bachta for drawings of the system. Bachta responded by telling Bowles not to worry about drawings, be-

cause Standard knew what it wanted. (Bowles, direct, December 1, 1982). Secondly, in the very beginning of June, 1973, Standard requested and received a telephone price quotations from both Bethlehem and the United States Steel Corporation for eight pieces of $3\frac{1}{8}$" bridge strand, each 190 feet in length with $3\frac{1}{4}$" modified open strand sockets. (Bachta, direct, November 2, 1982; Plaintiff's Exhibits 13, 14, 75). Finally, on June 6, 1973, the plaintiff telephoned Bethlehem and placed an order for the bridge strand cable product.[3] (Bachta, direct, November 2, 1982; Bergmark, Tr. 28–29). On June 7, 1973, in response to Standard's order, Bethlehem sent a letter to Standard. That letter advised Standard that Bethlehem had entered its order on June 7, 1973, described the product to be delivered in detail, articulated the terms and conditions of shipment and delivery, and stated,

"Terms and Conditions-Wire Rope attached are made part of this order.

If you have any questions, please advise."

The "Terms and Conditions of Sale" page attached included language which posited, in relevant part:

"All proposals, negotiations, and representations, if any, regarding this transaction and made prior to the date of this quotation or proposal are merged herein."

. . . .

"EXCLUSION OF WARRANTIES— THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR PURPOSE ARE EXCLUDED FROM ANY CONTRACT RESULTING FROM THIS QUOTATION OR PROPOSAL." (Bold print in original). (Plaintiff's Exhibit 18).

The letter also contained a subsection limiting the buyer's remedies to replacement of "non-conforming materials" and to exclude labor expenditures and "any special, direct, indirect, incidental or consequential dam-

---

3. It is noteworthy that Wolchuck and Mayrbaurl, Elgood-Mayo Corporation and perhaps other of the plaintiff's consultants were aware of and did not object to or disapprove of Standard's plan to use bridge strand. (Bachta, cross, November 4, 1982).

ages," as well as a subsection which claimed that a purchase order would not "RESULT IN A CONTRACT UNTIL IT IS ACCEPTED AND ACKNOWLEDGED BY THE SELLER'S GENERAL SALES OFFICE." (Bold print in original) (Plaintiff's Exhibit 18).

Thereafter, Bethlehem sent Standard such a formal "Acknowledgement" which provided, in pertinent part:

"We thank you for the order listed above which we are pleased to have accepted subject to only those terms and conditions of sale which are set forth above and on the reverse side hereof.

"Trusting that we have your assent to these terms and conditions we accordingly have entered your order in our mill schedule."

On the reverse side, under the heading, "TERMS AND CONDITIONS OF SALE," (bold print in original), Bethlehem stated, in part:

"In accordance with usages of the trade, your assent to the terms and conditions of sale set forth below and on the reverse side hereof shall be conclusively presumed from your failure seasonably to object in writing and from your acceptance of all or any part of the material ordered."

Thereafter, using virtually identical language, and, in the case of the exclusion of warranties, once again, in bold print, Bethlehem repeated the merger clause, the exclusion of warranties, and the limitation of buyer's remedies present in its June 7, 1973 letter to Standard. The only difference in language between the two documents indicated that Bethlehem considered a contract to have been formed at the time of the Acknowledgment, but not when the June 7,

1983 letter was mailed. (Plaintiff's Exhibits 18, 19).

Standard received this Acknowledgment on June 14, 1973, (Plaintiff's Exhibit 19), yet neither repudiated the terms and conditions contained in the June 7, 1973 Letter of Acknowledgment, nor even discussed these terms and conditions with any employee of Bethlehem. (Bachta, direct, November 16, 1982; Oral Stipulation, plaintiff's counsel, November 3, 1982.)

Bachta, the plaintiff's officer most intimately involved with the purchase, read and clearly understood the terms and conditions included in both documents. Bethlehem and Standard were no strangers to each other. Bachta testified that the two companies had always had a close relationship; Bethlehem, in fact, had been a major supplier of Standard's for some sixty-two years, as of the fall of 1982. (Bachta, Deposition Transcript, October 19, 1982, at 263). As a long-time customer of Bethlehem's, Standard and indeed Bachta himself knew, and admitted that it was Bethlehem's policy to sell products only under the terms and conditions listed on both documents, namely, disclaiming expressly the implied warranties of merchantability and fitness for a particular purpose. (Bachta, cross, November 4, 1982). Despite this knowledge, Bachta chose to ignore said terms and conditions. More important, it is to be noted that Bachta testified he deliberately attempted to avoid these terms and conditions by purposely failing to send a written purchase order to Bethlehem and by relying instead on what he viewed as an oral agreement struck with Ronald Bergmark on May 31, 1973. A written purchase order, introduced as Defendant's Exhibit 9, was produced by plaintiff for its internal accounting purposes only and was never sent to Bethlehem. (Bachta, cross, November 4, 1982, Defendant's Exhibit 9).[4]

---

4. Although certainly not dispositive of the implied warranty issues of this case, it is significant that, when Standard wished to extract express warranties of fitness for a particular purpose and of merchantability from the Elgood-Mayo Corporation concerning the jacking system, Standard possessed the sophistication and legal wherewithal to draft a formal purchase order reflecting these desires quite explicitly.

Said purchase order, composed by Standard's Secretary and Legal Counsel, M. Bassevitch, included the following clauses:

"Elgood-Mayo has been informed as to the purpose and intended use of said rental equipment and services. Standard agrees to rent said equipment relying upon the representations of Elgood-Mayo that said equipment, from an engineering standpoint, is sufficient

Before the delivery of the ordered "bridge strand", Bethlehem added a pad eye connection to each length of the strand. The pad eye connection was used in lieu of another connection and was secured to the butt end of the strand by welding. One function served by the pad eye connection was to prevent individual wires from unravelling. In addition, Bethlehem installed a socket connection on the lifting end of each strand. The lifting end of a length of bridge strand is situated at the opposite end of the pad eye connection. One purpose of the socket end connection was, like the pad end connection, to prevent individual wires from unravelling. Bethlehem installed the socket connection with molten zinc. Neither the plaintiff nor Bethlehem performed any further modifications upon or adaptations to the length of bridge strand ordered by Standard.

The plaintiff paid for the bridge strand in full and, in October, 1973, Bethlehem delivered the ordered strand to the plaintiff's job site at the Gold Star Memorial Bridge. The strand was delivered by truck and was shipped on reels of 110 inch diameter and a 9½ foot arc, with two pieces of strand per reel. (Bachta, direct, November 2, 1982, cross, November 4, 1982). From October, 1973 until April, 1974, the bridge strand was stored at the job site on the reels upon which it was delivered. (Bachta, cross, November 4, 1982).

In late April, 1974, the bridge strand was removed from storage and the plaintiff began to install it into the jacking system. To install the cable, the plaintiff's employees attached a boom to the strand by the strand's pad eye bolt and threaded the strand through the grippers. The plaintiff's employees removed the strand from the reel on which it had been stored by rolling the reel on a pipe. This rolling and threading process was long, slow and tedi-ous. It involved the use of at least six and perhaps as many as ten men and consumed approximately four hours per cable. The cable unrolled at the rate of about one foot per minute. Quality control workers inspected the cable as it unrolled. (Bachta, cross, November 4, 1982). None of the plaintiff's personnel involved in the threading operation or the inspection noticed any defects in the strand as it was removed from the reel. Although the slow, unrolling and threading process provided ample opportunity to observe kinks in the strand or individual wires appearing out of lay, no such problems were observed. With the exception of a weld break in the strand installed on the northwest shear leg, a break repaired by Standard and not considered serious enough to report to Bethlehem, the bridge strand appeared to be in the same condition when installed as when it was delivered to the plaintiff. (Bachta, cross, November 4, 1982; Gilbert, cross, November 16, 17, 1982).

When the first cable was threaded, there were neither cable guides nor channel bars or guides on the derricks. (Bachta, direct, November 3, 1982). Soon after installation, however, both were added to protect the grippers and other parts of the jacking system, and to facilitate the jacking operation. At the very end of April or the very beginning of May, 1974, the plaintiff, according to specifications developed jointly by the plaintiff, Donald Brennan of Elgood-Mayo, an expert engineer, and other expert consultants, welded cable guides to the shear legs for each of the bridge strand lifting cables. (Bachta, Deposition Transcript, October 26, 1982, at 351). These original cable guides consisted of steel pieces to which were welded ten inch diameter pipes. The guides had flanges on both ends to prevent the cable from slipping off

and adequate to perform the work required on the job.
"Elgood-Mayo warrants and represents that said equipment at the time of delivery to Standard and completion of the initial operations supervised by Elgood-Mayo at the job site including without limitation the assembly, installation of all hydraulic, air and elec-trical equipment will be in good and proper condition and repair and suited to perform the work required on the job." (Defendant's Exhibit 6).
Standard sent with this purchase order a cover letter requiring that Elgood-Mayo sign the order and return one copy. (Bachta, cross, November 4, 1982; Defendant's Exhibit 6).

and falling. Each guide was approximately three feet long, eighteen inches deep, seven and one-half inches wide, and was shaped like an "I" beam. Each guide weighed approximately 150 pounds. (Bachta, direct, November 2, 3, 1982). The diameter of the arc of the cables when they were hanging over the guides was no more than two to three feet. (Bachta, cross, November 4, 1982; Plaintiff's Exhibit 21).

On or about May 7, 1974, the plaintiff installed two channel guides or bars according to its own plans and specifications. These channels were placed approximately one foot above each upper gripper as a supplement to the cable guides, which sat approximately six feet above the channel guides. The plaintiff installed these channels at the request of Elgood-Mayo, both to keep the cable from hanging over and damaging the grippers and to provide for a vertical entry and exit of the lifting cables into or from the grippers. (Bachta, direct, November 3, 1982). At the time this work was done, the "CONTRACTORS' EQUIPMENT FORM (All Risk)" policy had already been acquired by the plaintiff. It was then in effect and had been since October 1, 1973.

On May 11, 1974, the lifting system performed its first experimental lift, or "test pick," without difficulty. During the test pick, the new center bridge span yet to be installed was lifted off of a barge in the river to a height of approximately fifteen feet and then lowered several times. The plaintiff undertook this exercise to ensure that all systems were functioning properly and to determine how long certain operations would take to complete. During the test pick, no stress was placed on the cable guides, as the lower, and not the upper section of the system, bore the weight. No defects or irregularities were noticed during this exercise. (Bachta, Deposition Transcript, October 26, 1982, at 357–60).

On May 15, 1974, the plaintiff prepared for the first operational pick of the lifting system, the lowering of the old existing center span of the Gold Star Memorial Bridge. The plaintiff's employees encountered two slight problems just prior to this pick. Before May 15, 1974, the lifting cable had only extended several feet above the upper gripper. However, as the length of the lifting cable above the upper gripper was increased in preparation for the first pick, an overhaul problem was experienced. In an attempt to remedy this problem, rope lines were tied to the pad eye ends and were held in place by ironworkers. Secondly, Standard experienced some difficulty in freeing the center span from the rest of the bridge. Eventually, the center span was cut away from the remaining sections of the bridge with an acetylene torch. When all four corners of the span had been cut, the bridge span swung free and its weight was transferred to the lifting system. (Bachta, direct, November 3, 1982; Gilbert, direct, November 16, 1982; Iacozza, direct, November 19, 1982). This event marked the first time that (1) the bridge strand cables had been lifted to their maximum height, and (2) the cable guides had borne the significant dead weight of the free end of the cable, approximately 2500 to 3000 pounds. (Bachta, direct and cross, November 3, 1982, cross, November 4, 1982, cross, November 12, 1982).

Standard then began to lower the center span. After it had been lowered approximately one to two strokes of the hydraulic jack, about five to ten feet, a process which dragged the very heavy weight of the dead end of the cable over the single-point, small arc cable guides, the 150 pound cable guide on the northeast shear leg broke completely free from the shear leg at the weld, fell to the barge deck, and then bounced into the water. As a result, the approximately 2500 to 3000 pound free end of the cable cascaded violently into the channel bars below, striking and severely bending them just above the gripper system.

This event also caused substantial damage to the A–1 terminal box which housed critical components of the electrical, air and hydraulic systems, as well as a loss of electrical power. (Bachta, direct, November 3, 1982, cross, November 4, 1982, cross, November 10, 1982). Due to the loss of

electrical power, the lowering operation ceased. Shortly thereafter, Standard discovered that the cable guide on the southwest shear leg, identical to that on the northeast shear leg, had begun to twist and was significantly bent. Damage, however, was limited to the northeast and the southwest cable guides. None of the remaining six cable guides exhibited damage at any time after this incident. None of the pieces of bridge strand deployed in the other six guides ever displayed damage to wires contained therein. (Bachta, direct, November 3, 1982, cross, November 4, 1982).

Immediately, Standard began to repair the electrical and hydraulic systems and to install substitute cable guides on both the northeast and southwest shear legs. The new guides consisted of shackles, shives and chokers, also known as slings. The substitute guides allowed for a much greater arc for the bridge strand cable than did the original guides. In fact, the redesigned cable guide system installed permanently subsequent to May 23, 1974 increased the diameter of the arc of the cables from approximately 2 or 3 feet to 10 feet.

Approximately forty minutes after the fall of the northeast cable guide, and when the remedial work was almost completed, one or more of the positioning cables holding the barges, which supported the entire lifting apparatus in place on the river, broke.[5] The barge assembly drifted, and the derricks, still holding the suspended center span, or the suspended center span itself, made slight contact with the cantilever section of the remaining bridge. Tugboats were called in to secure the derricks. This accident, hereinafter referred to as the "second accident," applied some force to the bridge strand lifting cable, as that cable was already supporting a 360 ton center span, when the contact occurred between the lifting system, the suspended center span, and the still-standing bridge section. Contrary to the plaintiff's contentions that a "big wind" caused the second accident, the Court finds that the wind was calm throughout the working day, and that, at the time of the second accident, the wind velocity was normal and calm, approximately ten to twenty knots.

As a result of the second accident, further damage was sustained by the electrical, hydraulic and air systems. An electrical conductor was sheared and the hydraulic and air hoses and parts, which had previously been secured to the derrick, became unsecured and dangled loose and damaged. Repair work continued until May 16, 1974. On May 17, 1974, Standard completed the lowering of the center span, placed it upon a transportation barge, and floated it away from the work site.

On May 23, 1974, Standard began the second phase of the bridge dismantling procedure, namely, the lowering of the west cantilever portion of the bridge. The plaintiff's employees freed this section from the remaining structure, and began the lowering process of the section. Shortly after this second pick began, Standard employees noticed that one or more of the wires contained in the northeast shear leg's bridge strand had been severed and was being pushed away from the cable and outside of the grippers. (Bachta, direct, November 3, 1982). As a result, crew members encountered great difficulty in working the cable through the gripper system, as the enlarged and damaged bridge strand could not pass through the grippers. To remedy the problem, Bachta ordered his crew to cut the broken wires and bind their ends to the cable with electrical tape. This operation allowed Standard to hand-feed

5. Each barge base had four separate steel wire rope positioning cables, which were positioned at each of the four corners of the barge base. The north barge base had a hoisting engine which accommodated the four steel wire rope positioning cables, and the south barge base had two hoisting engines to which were attached two steel wire rope positioning cables each. In addition, nylon hawsers helped secure the barge bases. Once a derrick barge base location was established, the hoisting engines were dogged off, and the steel wire rope cables attached to fixed objects outside the barge. At the time of the second accident, the hoisting engines had been dogged off and all cables secured.

the cable into and through the grippers. (Bachta, direct, November 3, 1982).

After the west cantilever span had been lowered several more strokes, Standard noticed a similar problem with the southwest shear leg strand. Similar repairs were conducted and the lowering continued. After the repaired sections of the cable passed through the grippers, Standard employees noticed that several more wires had been broken by the grippers and that some wires which comprised the strand had gone out of lay. (Bachta, direct, November 3, 1982). Standard employees expended three working days hand-feeding and repairing the broken strand. Eventually, the lowering of the west cantilever section was completed in this fashion.

On May 29, 1974, in response to a call from Standard, Carl Smollinger, a Bethlehem Steel engineer in the Wire Rope Division, travelled to the Gold Star Bridge site for a field inspection. He was accompanied by Bethlehem Steel salesman John Bowles. Upon arriving, Smollinger and Bowles met briefly with Joseph Bachta and Howard Shea of Standard and with Gerald Levy and Donald Brennan of Elgood-Mayo, Smollinger, accompanied by Bowles and an ironworker, then proceeded to inspect the damaged cables while riding in a scale box, a platform hung by cables from a crane, along the suspended cables.

Upon close observation, Smollinger observed seven broken wires, three in one of the cables and four in the other. The damage on the northeast bridge strand was thirty-seven (37) feet from the lifting end and one hundred forty-nine (149) feet from the eye or free end; the damage on the southwest bridge strand was seventy-eight (78) feet from the lifting and one hundred ten (110) feet from the eye end. The northeast damage extended for approximately nine (9) feet, and the southwest damage for approximately two (2) feet. The damage on the southwest cable was one hundred ten (110) feet away from the point at which wires had broken free from the weld, and

there was no evidence of damage in between. (Bachta, cross, November 12, 16, 1982; Broderick, Tr. 109, 183). The damaged area on the northeast cable extended from slightly below the bottom gripper up to the channel bar, against which the dropped cable had fallen on May 15, 1974. (Bachta, cross, November 16, 1982; Broderick, Tr. 183–84). The damage on the southwest strand was on the loose or free end, having passed over the cable guide, at time of the bending accident on May 15, 1974.

With Bachta's permission, Smollinger had an ironworker cut four samples from some of these broken wires for analysis. Several other samples had already been burned off by the time Smollinger arrived.[6] Upon visual inspection, Smollinger noticed that the broken wires had been severed, not pulled apart or broken by fatigue. (Smollinger, Tr. 104, 113–14). The cable guide configuration which Smollinger observed on May 29 was the configuration in place at the time of the second pick on May 23.

Upon dismounting the scale box, Smollinger informed Bachta that the broken wires had not significantly decreased the strength of the strand. In fact, Smollinger estimated that the broken wires resulted in only a 4% loss of strength, and so informed Bachta. Moreover, even representatives of United States Steel Corporation, a competitor of Bethlehem's, told Bachta that several broken wires would not significantly weaken the bridge strand. (Bachta, cross, November 4, 1982). The other six cables, those not part of the northeast or southwest booms, were undamaged and were used without incident throughout the remainder of the job.

Bachta, Bowles and Smollinger then went to lunch together. At this time, Bachta told Smollinger that he was about to have the lifting sockets burned off the damaged cables. This news upset Smollinger, because, as he informed Bachta, new sockets would be difficult to obtain upon such short notice. Without sockets,

---

6. In all, Smollinger removed some eight segments of wire from the damaged bridge strands for analysis. Bethlehem Steel reported on four of the eight samples taken by Smollinger.

there was no longer any possibility of using the damaged cable strands to complete the job, despite the fact that they remained sufficiently strong to satisfy the plaintiff's needs. (Smollinger, Tr. 159–61, 189–91; Bowles, direct, December 1, 1982). Smollinger's efforts then turned from repair to replacement.

Smollinger contacted the Bethlehem plant and was informed that there was no 3⅛″ diameter strand available, but that 3¼″ strand was available and ready for shipping. Bethlehem was well aware at that time that the new strand would be used for lifting. The plaintiff accepted this size bridge strand, asked for two 200-foot long pieces, and then proceeded to load the reels and the burned-off sockets onto a truck. (Bachta, direct, November 3, 1982; Bowles, direct, December 1, 1982; Smollinger, Tr. 193–94).

At this time, Bachta understood that Standard would pay for the replacement strand, and Standard did. Bachta also specifically requested "bridge strand" and not wire rope, as the replacement cable strand. (Bachta, direct, November 3, 1982; Smollinger, Tr. 195–96). The truck carried Smollinger, the sockets and the reels to the Bethlehem plant in Williamsport, Pennsylvania. There, the sockets were installed on the replacement strand, and the new pieces were delivered to the Gold Star job site on June 1, 1974, approximately thirty-six hours after Smollinger's visit. (Bachta, direct, November 3, 1982; Bowles, direct, December 1, 1982; Smollinger, Tr. 195).

The new strand was successfully installed into the northeast and southwest shear legs and along with the six other, original pieces of bridge strand, was used without damage or problem throughout the rest of the job. Standard still owns the strand today, and plans to market its lifting system, using strand, for future jobs. In 1975, Bachta estimated that the strand was worth some $32,000 to Elgood-Mayo, the owners of the jacking system. (Bachta, direct, November 3, 1982, cross, November 4, 1982; Defendant's Exhibit 13).

Experts from both sides of this dispute agreed that the broken wires in the northeast and southwest bridge strands were severed by the force of the grippers squeezing an out of lay, or displaced wire or wires into other wires. (Bachta, direct, November 3, 1982; Broderick, Tr. 177; Smollinger, Tr. 114–16; Defendant's Exhibit 5). Although the parties offered many, various theories concerning how these wires were displaced or popped out of lay, the Court finds only one of these theories persuasive. Forsaking its original spring of 1973 plans, which allowed for a diameter of over ten feet of arc for the cable passing over the cable guides, the plaintiff and Brennan of Elgood-Mayo defectively designed new cable guides with an insufficient diameter, which were in place on May 15, 1974, the date of the initial problem. This defective design precipitated the damage in the following manner. Each cable guide, a single-point system, with an arc of only approximately three feet, caused the bridge strand to bend at an overly-sharp angle, especially when the dead weight of the end length of the strand (approximately 2500–3000 pounds) was suspended over the cable guide. The pressure resulting from this bending forced the cable to go kitty-corner on the cable guide, and as the section of bridge was being let down, it pulled the cable over it with great friction and pressure, so as to snap off the northeast shear leg cable guide and severely bend the southwest shear leg cable guide. (Bachta, Deposition Transcript, October 26, 1982, at 370). As a consequence of the snapping of one cable guide and the bending of another, and the friction of the cable bending over the small arc of the cable guides, wires of the strands carried over each guide were popped out of lay. (Taylor, Deposition Transcript, at 27–30). When these displaced, or out of lay wires passed through the grippers, and were squeezed by the tremendous force generated thereby, the wires ruptured. This conclusion is reinforced and substantiated by persuasive evidence.

First of all, it was virtually impossible for Bethlehem to have manufactured

bridge strand through its machinery with a wire out of lay. The machines utilized by Bethlehem to form individual wires into a completed bridge strand processed the individual wires through a head plate, or die, which aligned them. Any wires which overlapped or were displaced could not have fit through the headplate and would have been twisted off or broken. An engineer employed by Bethlehem since 1948 testified that he had never seen this occur. (Schwenke, Tr. 24–27, 40–42). Moreover, the strand sold to the plaintiff was part of a larger batch manufactured at the same time by Bethlehem and sold to another customer. Bethlehem never received any complaints from this other customer regarding the quality of the strand. (Smollinger, Tr. 180). Finally, although industry standards dictate that the outer wires of the strand should not be welded, evidence adduced by Bethlehem indicated that these outer layers were not, indeed, welded. (Schwenke, Tr. 49–55, 115). The plaintiff presented no evidence to the contrary.

Secondly, the plaintiff's chief expert, Joseph Bachta, believed that the lack of a proper cable guide caused the damage to the bridge strand, and admitted that there were no defects in the strand itself. (Brennan, Deposition Transcript, at 45, 77; Andrews, cross, December 1, 1982). And in spite of the ample opportunity which they had to inspect the strand while it was being unrolled from its storage reel, no Standard employees discovered any defect in the bridge strand until after May 15, 1974, the date of the incidents being litigated here. (Bachta, cross, November 3, 4, 1982; Gilbert, cross, November 17, 1974).

Thirdly, Bethlehem's visual, chemical and metallurgical tests indicated that the wire samples met all specifications. The visual examination specifically revealed that the "cupped or dished contour" of the severed wires matched the dimension of the wires themselves, and concluded that "displaced external strand wires were squeezed under high loads until rupture occurred." (Defendant's Exhibit 5). Although in possession of damaged lengths of bridge strand from the very date of the accident, the plaintiff had never tested the samples itself, and has never sought to analyze the samples tested by Bethlehem. As a result, the Bethlehem tests stand uncontroverted.

Fourthly, although neither Bethlehem nor the wire rope industry as a whole had published any recommendations concerning the arc of cable guide systems at the time of the incidents at issue, there is ample evidence that the plaintiff was then aware of the possible danger involved with an insufficient diameter. Under normal circumstances, bridge strand, if allowed to make its own arc, will not become noticeably out of round. However, during May, 1974, just before the May 15, 1974 incident, Donald Brennan, an Elgood-Mayo engineer, informed Howard Shea and even Joseph Bachta, that he feared the diameter was too small and that the cable guide, or fair leader should be some fifty to sixty times the diameter of the bridge strand used to protect the strand from damage. After May 15, 1974, Brennan informed Bachta that he definitely considered the small diameter to have been the cause of the damage. (Brennan, Deposition Transcript, at 17–18, 22, 24, 40–41; Bachta, direct, November 1982). Otherwise, a cable guide with an insufficient diameter could cause the bridge strand to kink or to flatten out or could indeed cause individual wires to break or to pop out of lay. (Brennan, Deposition Transcript, at 41; Taylor, Deposition Transcript, at 22). Moreover, in May, 1974, after the cable guides were installed, John Taylor, the superintendent in charge of the steel erection under Bachta, informed the latter that the friction or pressure generated by the cable bending over the small arc of the cable guides would damage the cable or would break the guides. (Taylor, Deposition Transcript, at 27–31). Most persuasively, after May 23, 1974, and after consulting with Brennan who theorized that a small cable guide diameter caused the damage to the strand, the plaintiff permanently redesigned the cable guide with a diameter of over ten feet. (Bachta, direct and cross, November 3, 1982; Bachta, cross November 12, 1982;

Brennan, Deposition Transcript, at 17–18, 40–41). Since that time, and throughout the remainder of the raising and lowering operation at the Gold Star Memorial Bridge, no further damage occurred to any of the cable strand used or to the cable guides themselves.

Bridge strand was appropriate for use in the jacking system employed by Standard in dismantling the Gold Star Memorial Bridge and erecting the new one. While strand is normally used in static applications, it has certain advantages over wire rope in lifting operations, having a higher strength to weight ratio and a similar diameter for a given strength then does wire rope. Moreover, when used in conjunction with grippers, the smooth surface of bridge strand is beneficial for distributing the bearing pressures of the gripper along the entire face of the strand. Wire rope, which does not have a smooth surface, could not distribute the pressure equally along its outer layer. As long as bridge strand can travel along an arc with a sufficiently large diameter, and is protected from sharp edges, it serves well as lifting cable for a jacking system such as Standard's. The fact that it was used in this fashion quite satisfactorily after the cable guide arc diameter was redesigned after May 23, 1974 illustrates this point. (Schwenke, Tr. 59–65, 71–72; Bachta, direct, November 3, 1982; Brennan, Deposition Transcript, at 47.)

The Court finds that Bethlehem did not manufacture the ultimately damaged strand with any defect. Moreover, drawing reasonable conclusions as a consumer would, based upon knowledge common in the community, the Court finds that said strand was not unreasonably dangerous; it was not dangerous to an extent beyond that which would be contemplated by the ordinary consumer. Further, the Court finds that, at the time Bethlehem sold the strand to Standard, Bethlehem employees thought (1) that the strand was to be used as a static member of the proposed lifting system, and (2) that the cable guides would allow for a much greater diameter to the arc of the strand passing over them (some seventeen feet) than they actually did (approximately three feet) at the time of the incidents at issue. In sum, it was Standard's design and use of such strand as an operational, and not a static member of the lifting system, stretching said strand over a single-point cable guide at an overly-sharp angle with an insufficient diameter to its arc which caused the damage to the strand.

On or about October 1, 1973, Standard originally purchased a CONTRACTOR'S EQUIPMENT FORM (All Risk) insurance policy from the defendant Liberty Mutual.[7] This policy covered the period from October 1, 1973 until October 1, 1974, and was in effect at the time of the incidents complained about. The CONTRACTORS' EQUIPMENT FORM (All Risk) insurance policy (hereinafter, "the policy") stated, in pertinent part:

"3. THIS POLICY INSURES AGAINST:

All risks of direct physical loss or damage to the insured property from any external cause, except as hereinafter provided.

"4. THIS POLICY DOES NOT INSURE AGAINST:

. . . .

(g) Loss or damage due and confined to wear and tear, mechanical breakdown, inherent vice, latent defect, gradual deterioration or depreciation, insects or vermin;" (Bold print in original) (Plaintiff's Exhibit 1).

On or about June 7, 1974, Standard gave written notice to Liberty Mutual that it had experienced "difficulty" in the operation of the floating derrick lifting system at the Gold Star Memorial Bridge job site. (Plain-

---

7. The plaintiff argues that the CONTRACTORS' EQUIPMENT FORM policy, rather than the INSTALLATION RISKS FORM policy, covers its damages, and the defendant Liberty concurs. Throughout its post-trial documentation (Trial Brief, Proposed Findings of Fact and Conclusions of Law), Liberty cites policy language from the CONTRACTORS' EQUIPMENT FORM policy, and not from the INSTALLATION RISKS FORM policy.

tiff's Exhibit 26). Standard filed a proof of loss under the date of June 9, 1974. This proof of loss, signed by Mr. Golding, Standard's President, indicated that certain losses occurred on May 15, 1974 as a result of "wind storm damage," and that such damage was not discovered until May 24, 1974. (Plaintiff's Exhibits 27, 28, and 29). The damage was therein described as "removal and replacement of damaged cable." The cost was estimated at approximately $150,000.00.

In its investigation, Liberty Mutual, and Teledyne engineers it had hired to inspect the damage, encountered some difficulty with Standard employees on visits to the Gold Star site on the dates of July 15, 1974 and August 15, 1974. However, the Court finds that Standard provided Liberty Mutual with reasonable notice and cooperation under the circumstances, that Liberty Mutual was able to conduct an investigation satisfactory for its needs, that Liberty Mutual was not prejudiced in any material way in its investigation of the damages claimed by Standard, and that Liberty Mutual's interests were not adversely affected in any substantial or material way.

The defective design of the cable guides by the plaintiff was the proximate cause of all damage to the bridge strand cable itself, to the northeast cable guide that broke off and fell into the river, the southwest cable guide, which was bent, the northeast channel bars or guides, and to the electrical, hydraulic, and air systems which became impaired when terminal box A–1 was hit by the falling cable. In short, the defective design of the cable guides caused all the damage which resulted from the fall of the northeast cable guide and the bending of the southwest cable guide.

In early 1973, the cable guides were originally correctly designed in the preliminary drawings and specifications, with a planned arc of approximately ten feet in diameter. On June 6, 1973, however, the plaintiff finalized its plan for a cable guide allowing for an arc of only two to three feet in diameter. These defectively designed cable guides were ultimately installed in early

May, 1974. At the time of the issuance of the insurance policy, neither party thereto was aware of the defective cable guide design.

The second accident for which a claim was filed concerned the breaking of one of the positioning cables, which caused further damage to the electrical, hydraulic and air systems. This damage included the shearing of an electrical conductor, and the unfastening of certain hydraulic and air hoses and parts. As this case was bifurcated, and tried on the issue of liability only, damages cannot be established until a hearing in damages occurs.

*Conclusions of Law*

The Court's jurisdiction over this case is based upon diversity of citizenship under 28 U.S.C. § 1332. As such, the Court must apply the substantive law of the forum state, Connecticut, *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), including Connecticut's choice of law rules. *Klaxon v. Stentor Electric Manufacturing Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941), *Gannett Co. v. Register Publishing Co.,* 428 F.Supp. 818, 824 (D.Conn.1977). Both actions presented here revolve around contracts which had their operative effect or place of performance in Connecticut: (1) a contract to deliver bridge strand for use at a job site in Connecticut, and (2) a contract to provide insurance coverage for certain property in Connecticut. Therefore, Connecticut law governs. *Jenkins v. Indemnity Insurance Co.,* 152 Conn. 249, 253, 205 A.2d 780 (1964): *Whitfield v. Empire Mutual Insurance Co.,* 167 Conn. 499, 506, 356 A.2d 139, 143 (1975).

### A. *Strict Liability Claim Against Bethlehem Steel*

Standard avers that Bethlehem is strictly liable in tort for allegedly having manufactured a defective product which harmed the plaintiff. As the events in this case occurred before the effective date of Connecticut's Product Liability Act, Conn.Gen. Stat. § 52–572m *et seq.,* this case is gov-

erned by pre-act Connecticut common law, which drew heavily upon § 402A of the Restatement (Second) of Torts.

■ Under § 402A, the plaintiff must prove, by a preponderance of the evidence, five elements. These elements are, that: "... (1) the defendant was engaged in the business of selling the product; (2) the product was in a defective condition unreasonably dangerous to the consumer or user; (3) the defect caused the injury for which compensation was sought; (4) the defect existed as the time of the sale; and (5) the product was expected to and did reach the consumer without substantial change in condition." *Giglio v. Connecticut Light & Power*, 180 Conn. 230, 234, 429 A.2d 486 (1980). No dispute exists concerning elements (1) and (5), but the Court finds that the plaintiff has failed to prove an unreasonably dangerous defect under (2) or causation under (3) by a fair preponderance of the evidence.

■ As element (2) indicates, the plaintiff must prove a defective condition in the product which is "unreasonably dangerous" to those using the product. The Connecticut Supreme Court has defined this term as " 'dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics.' " *Id.*, citing Comment i, § 402A Restatement (Second) Torts, (1965). A plaintiff need not prove a "specific defect," as long as he can prove an "unspecified dangerous condition." *Id.*, 180 Conn. at 235, 429 A.2d 486. The question of "whether a product is unreasonably dangerous is a question of fact to be determined by" the trier of fact, drawing its own reasonable conclusions based upon the expectations of an ordinary consumer and community common knowledge. *Id.*

■ The Connecticut cases illustrate that the "unspecified dangerous condition" doctrine stands for the proposition that, given the facts surround many strict liability cases (which often involve grave damage to, or total destruction of the allegedly defective property), a strict liability plaintiff may not be able to specify which component part of a product caused the harm and need not do so. Rather, as in any case, such a plaintiff may marshal "circumstantial evidence to establish the dangerous condition of the product." *Liberty Mutual Ins. Co. v. Sears, Roebuck & Co.*, 35 Conn. Supp. 687, 690–91, 406 A.2d 1254 (1979). *See also Kileen v. General Motors Corporation*, 36 Conn.Supp. 347, 349, 421 A.2d 874 (1980). As such, where "other identifiable causes are absent," then "mere evidence of a malfunction" may be enough to allow the trier of fact to draw an inference, by a preponderance of the evidence, that the product was unreasonably dangerous and defective. *Id., Liberty Mutual, supra.*

Such is not the case here. The Court, sitting as the trier of fact in this court-tried case found, by drawing upon community common knowledge and ordinary consumer expectations, that the totality of credible evidence, both direct and circumstantial, demonstrates that the strand was neither defective nor unreasonably dangerous. The cable strand in issue was not "dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it," and was manufactured free of defect. Moreover, the Court has identified the cause of the damage to the strand. Only when the strand was stretched over a cable guide improperly designed with an insufficient arc to its diameter, did the northeast cable guide snap and the southwest cable guide bend, causing the damage to the "bridge strand." *See* Findings of Fact, at 26–32.

■ The plaintiff has failed to carry its burden of persuasion concerning the product being defective and unreasonable dangerous. Similarly, as the Court has found the damage resulted from a source external to the strand itself, the plaintiff cannot prove a causal connection between any "defect" inherent in the strand and the damage to the strand, even if the plaintiff had been able to prove an unreasonably

dangerous defendant in the strand. Thus, the plaintiff cannot recover from Bethlehem under a theory of strict liability in tort.[8]

### B. *Implied Warranty Claims Against Bethlehem Steel*

The plaintiff claims that Bethlehem has breached its implied warranty of merchantability under Conn.Gen.Stat. § 42a–2–314 and its implied warranty of fitness for a particular purpose under Conn.Gen.Stat. § 42a–2–315.[9] The Court finds (1) that Bethlehem successfully disclaimed both implied warranties, and (2) assuming *arguendo* that Bethlehem did not effectively disclaim both implied warranties, (a) no implied warranty of fitness for a particular purpose was ever created, and (b) the plaintiff has failed to prove a breach of the implied warranty of merchantability. The Court shall address these issues *seriatim*.

### 1. *Bethlehem Successfully Disclaimed Both Warranties.*

Connecticut General Statutes § 42a–2–314, the implied warranty of merchantability section, states, in pertinent part:

"(1) Unless excluded or modified as provided by section 42a–2–316, a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind ....

"(2) Goods to be merchantable must be at least such as (a) pass without objection in the trade under the contract description; ... (c) are fit for the ordinary purpose for which such goods are used, and (d) run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved...."

Connecticut General Statutes § 42a–2–315, the implied warranty of fitness for a particular purpose section, provides as follows:

"Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under section 42a–2–316 an implied warranty that the goods shall be fit for such purpose."

Both of these implies warranties, by their own terms, are subject to exclusion or modification by the disclaimer section, Conn.Gen.Stat. § 42a–2–316. This section posits, in relevant part:

"(2) Subject to subsection (3), to exclude or modify the implied warranty of merchantability or any part of it the language must mention merchantability and in case of a writing must be conspicuous, and to exclude or modify any implied warranty of fitness the exclusion must be in writing and conspicuous....

"(3) Notwithstanding subsection (2) ... (c) an implied warranty can also be excluded or modified by course of dealing...."

The Code defines "course of dealing" as "a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expression and other conducts." Conn.Gen.Stat. § 42a–1–205(1). Further, under the Code, "[a] course of dealing between parties ... give[s] particular meaning to and supplement[s] or qualif[ies] terms of an agreement." *Id.*, at (3). The Official Code Comment to this section, adopted by the Connecticut legislature, teaches that, " 'course of dealing' may enter the agreement ... by tacit recognition," as well as by explicit provisions listed

---

**8.** A duty to warn only arises from a product's unreasonably dangerous propensities, *Giglio, supra,* 180 Conn. at 235, 429 A.2d 486, and the Court has found no such propensities to have existed here, therefore, Bethlehem did not owe Standard a duty to warn.

**9.** There is no dispute that Article 2 of the Uniform Commercial Code covers the sale at issue here. The sale of bridge strand by Bethlehem to Standard was clearly a "transaction[ ] in goods" under Conn.Gen.Stat. §§ 42a–2–102 and 2–105.

in the agreement itself. *Id.*, Official Comment 3.

In determining whether Bethlehem has effectively excluded the implied warranties of merchantability and fitness for a particular purpose, the Court is guided by the general purposes and policies of the Code. The Code was designed to "simplify, clarify and modernize the law of commercial transactions." Conn.Gen.Stat. § 42a-1–102. *See also* W. Starr, "Connecticut Code Comments," Conn.Gen.Stat. § 42a, Art. I Introduction, at 40 (hereinafter "Starr"). The authors intended the Code to render "the law of commercial transactions ..., so far as reasonable, liberal and nontechnical." J. White, R. Summers, *Uniform Commercial Code*, (2d Ed.1980), at 15 (hereinafter "White & Summers"). In this spirit, "the Code 'de-formalizes' the requirements for the formation of contract in Article Two," *id.*, and restates the law concerning "warranties and the effect of disclaimers of warranties ... in terms more consistent with current business ethics and with less emphasis on the technicalities of the common law." Starr, Art. 2 Introduction, at 88. Nowhere is the handiwork of this spirit clearer than when dealing with merchants. "Merchants," by Code definition, include, *inter alia*, those who deal "in goods of the kind ... involved in the transaction" at hand. Conn.Gen.Stat. § 42a-2–104(1). Article 2 of the Code "assumes that transactions between [such] professionals in a given field require special and clear rules which may not apply to a casual or inexperienced seller or buyer," Conn.Gen.Stat. § 42a-2–104, Official Comment 1, and applies a special standard of "good faith" to a merchant's behavior. While the Code requires "good faith" of all parties in the "performance and enforcement of all agreements or duties," Conn.Gen.Stat. § 42a-1–203, Official Comment, it also requires merchants to be "honest[ ] in fact" and to observe "reasonable commercial standards of fair dealing in the trade." Conn.Gen.Stat. § 42a-2–103.

The final preliminary step before deciding whether Bethlehem effectively excluded both implied warranties in its sale of "bridge strand" to Standard is to examine the parties individually and their previous course of dealing with each other. Both parties were merchants in this transaction. Bethlehem both manufactured and distributed the bridge strand it sold to Standard. Standard, although never previously a purchaser of bridge strand, had often bought and used wire rope, a product of the same "kind" as bridge strand, in its operations. The two parties had a long-standing, 62-year relationship as buyer and seller of steel-based products at the time of the transaction at issue. During this relationship, which constituted a course of dealing, as that phrase has been defined by the Code (see § 42a-1–205(1), *supra*) Joseph Bachta, Standard's purchasing agent for this project, came to understand that Bethlehem would not sell its products without excluding the implied warranties of merchantability and fitness for a particular purpose. Thus, from the course of dealing between Standard and Bethlehem, Bachta knew that any purchase of steel products from Bethlehem would be contingent upon the exclusion of both of these implied warranties.

Bearing all of these principles—the Code definitions of warranty and effective disclaimer, the general policies and purposes of the Code, and the previous relationship of the parties—in mind, the Court finds that Bethlehem effectively disclaimed both the implied warranties of merchantability and fitness for a particular purpose in its sale of bridge strand to Standard. The Court finds that an oral agreement was formed between the parties on June 6, 1973, when Standard telephoned Bethlehem and placed an order for eight pieces of 190 foot-long 3⅛ inch in diameter bridge strand. At that time, under the Code, an agreement, or a "bargain of the parties in fact" existed. Conn.Gen.Stat. § 42a-1–201(3). This oral agreement included Bachta's prior understanding, derived from Standard's 62-year course of dealing with Bethlehem, that Bethlehem would not sell its products without exclud-

ing the implied warranties of merchantability and fitness for a particular purpose. Bachta's admitted efforts to circumvent these exclusions by deliberately not placing a written order (*see* pp. 13–14, *supra*) will be given no effect by this Court. Bachta's actions in this regard fall far below the standards of good faith required of merchants and other parties by the Code. The Court will not allow such actions, undertaken deliberately with bad faith to undermine commercially reasonable terms of an agreement understood clearly by both parties thereto as a result of prior transactions between them.[10] At the time of the agreement, Bethlehem knew it was excluding these warranties, and Bachta knew that by purchasing products from Bethlehem, he was consenting to these exclusions. Thus, the oral agreement struck on June 6, 1973 included an exclusion of both implied warranties at bar as a result of the course of dealing between the parties. Conn.Gen. Stat. § 42a–2–316(3)(c).

Understood against this background, the June 7, 1973 letter (Plaintiff's Exhibit 18) from Bethlehem to Standard serves as a written confirmation of the oral agreement. Such a written confirmation of an oral agreement was contemplated by both the authors and the commentators of the Code. White & Summers, at 35, *citing* § 42a–2–207, Official Comment 1. As the disclaimer language of the confirmation adds no additional or different terms, but merely reflects the exclusions already present in the oral agreement as a result of the course of dealing between the parties, the plaintiff's invocation of Conn.Gen.Stat. § 42a–2–207, the Code's "Battle of the Forms" section is unfounded.[11] The confirmation also satisfies the Code's Statute of Frauds provision, Conn.Gen.Stat. § 42a–2–201(1), and thus, gives evidence to an enforceable contract of sale, a "proposed deal which, in commercial understanding, has in fact been closed," Conn.Gen.Stat. § 42a–2–

207, Official Comment 2, by and between the parties. By Code definition, the word "contract" means the "total legal obligation which results from the parties' agreement as affected by this title [the Code] and any other applicable rules of law." Conn.Gen.Stat. § 42a–1–201(11). Therefore, as the "total legal obligation" between Bethlehem and Standard excludes the warranties of both merchantability and fitness for a particular purpose, Bethlehem has successfully disclaimed both these warranties in its sale of bridge strand to Standard.

### 2. *No Implied Warranty of Fitness for a Particular Purpose Was Ever Created.*

Assuming *arguendo* that Bethlehem did not effectively disclaim the implied warranty of fitness for a particular purpose, the Court finds that no such warranty was ever created under the facts of this case. The implied warranty of fitness for a particular purpose requires "that the seller have reason to know of a buyer's *particular* purpose and of the buyer's reliance on the seller's skill and judgment, as well as actual reliance in fact by the buyer." *Schneck v. Pelkey*, 176 Conn. 245, 254, 405 A.2d 665 (1978) (emphasis in original); *Blockhead, Incorporated v. Plastic Forming Co., Incorporated*, 402 F.Supp. 1017, 1024 (D.Conn.1975), White & Summers, at 358. This warranty is "narrow, more specific and more precise" than the warranty of merchantability, *Schneck, supra*, and is most commonly proven when a "businessman buys goods that have to be specially selected or particularly manufactured and assembled for his business." White & Summers, at 359.

In this case, both Ronald Bergmark, Bethlehem's salesman and William Schwenke, Bethlehem's Wire Rope engineer, suggested to Standard employees that "bridge strand" might be an appropri-

---

**10.** Adding an extra measure of bad faith to Bachta's actions in this regard is the fact that Standard certainly knew how to request express warranties of fitness for a particular purpose and of merchantability when it wanted to guarantee such coverage. *See* n. 4, *supra*.

**11.** It is noteworthy that the exclusions printed on the confirmation satisfy the requirements for express exclusions of the Code. Conn.Gen.Stat. §§ 42a–2–316(2), 1–201(10). *Koellmer v. Chrysler Motors Corporation*, 6 Conn.Cir. 478, 276 A.2d 807, 811 (Cir.App.1970).

ate product for the plaintiff's use. However, neither Bergmark nor Schwenke, nor their principal, Bethlehem, to whom their knowledge would be imputed, *Beech Aircraft Corporation v. Flexible Tubing Corporation*, 270 F.Supp. 548, 561 (D.Conn. 1967) had reason to know of the *"particular* purpose" to which Standard wished to put the strand. The plaintiff's employees, in fact, desiring to protect the secrecy of the lifting system, told both Bergmark and Schwenke that the strand was to be used as a static member of the system with grippers moving along it, rather than the moving member, as the strand was eventually used. With the exception of a drawing of a system which featured a cable guide of some seventeen feet in arc diameter, one which in no way resembled the final system's cable guide, with a diameter of some three feet, the plaintiff would not allow Bergmark to see any other technical drawings, as it considered them to be proprietary. It is noteworthy that the final design of the cable guide system ultimately used by the plaintiff was not even completed until June 6, 1973, (Bachta, Deposition Transcript, October 26, 1982, at 346–48), a week after the plaintiff's relevant communication with Bergmark and Schwenke. As the defendant's agents were thereby misinformed of the actual use to which the strand was to be put in a system not even completed at the time of the material communication between the plaintiff and Bethlehem, Bethlehem could not have and did not have the requisite knowledge of the particular purpose to which the product sold was to be put.[12] Thus, the events of this case do not give rise to the implied warranty of fitness for a particular purpose.

### 3. *The Bridge Strand Sold Was Merchantable and Did Not Cause the Harm Suffered by the Plaintiff.*

 Assuming *arguendo* that Bethlehem had not successfully excluded the implied warranty of merchantability, the Court finds that the plaintiff could not prove that Bethlehem breached said warranty in this case. The warranty of merchantability, in contrast to that of fitness for a particular purpose, "is the broadest and most important warranty in the Uniform Commercial Code." *Schneck, supra,* 176 Conn. at 253–54, 405 A.2d 665. Under Conn.Gen.Stat. § 42a–2–314, the "warranty of merchantability is implied in any sale of goods by a merchant seller." *Id.,* 176 Conn. at 254, 405 A.2d 665. To recover under this section, "a plaintiff must prove (1) that a merchant sold goods, (2) which were not "merchantable" at the time of sale, and (3) injury and damages to the plaintiff or his property (4) [were] caused approximately and in fact by the defective nature of the goods, and (5) [that] notice [was given] to the seller of injury." White & Summers, at 343. The Court has already established that Bethlehem's sale of "bridge strand" to Standard was a sale of goods by a merchant. The Court also notes that the plaintiff was injured when the wires of the strand popped out of lay and were severed, and that the defendant received notice of this injury. However, the Court further finds that the cable strand sold was merchantable under the Code and that no problems inherent with the strand caused the damage incurred by the plaintiff.

On this issue, the plaintiff essentially requests the Court to infer both nonmerchantability and causation. In its trial brief, the plaintiff argues (1) that the ordinary purpose for which this bridge strand was to be used was as lifting cable, (2) that this bridge strand failed while so being used, and (3) therefore, (a) the strand was not merchantable, and (b) the nonmerchantable quality of the strand caused the plaintiff's damage. Under the facts of this

---

**12.** Moreover, considering the total lack of input allowed to defendant Bethlehem's employees concerning the system's design, and the significant input of the consultants, such as Brennan, utilized by the plaintiff, the Court finds that Standard did not rely upon Bethlehem in the plaintiff's selection of bridge strand. In fact, Bachta claims to have relied on Brennan regarding the use of bridge strand. (Bachta, Deposition Transcript, October 19, 1982, at 297).

case, such a "[p]ost hoc, propter hoc" argument is equally inappropriate to prove either causation, White & Summers, at 356, n. 17 (and cases collected therein) or a lack of merchantability.

Many hours of trial and research time would have been eliminated had the issue been an exploding soda-pop bottle, which graciously would have allowed for a simple and obvious inference of a defect in merchantability. *See* White & Summers, at 350, n. 90, *citing Green v. The American Tobacco Co.*, 391 F.2d 97, 110 (5th Cir.1968) (*dissenting opinion adopted as majority opinion in* 409 F.2d 1166 (5th Cir.1969), *cert. denied*, 397 U.S. 911, 90 S.Ct. 912, 25 L.Ed.2d 93 (1969). This case, on the other hand, presented the Court with a difficult application of relatively vague and conclusory legal principles to highly controverted facts for its determination of merchantability.

▄▄▄ To be "merchantable" as that term is defined in the Code, goods must "pass without objection in the trade under the contract description," be "fit for the ordinary purpose for which such goods are used," and "run, within the variations permitted by the agreement of even kind, quality and quantity." Conn.Gen.Stat. § 42a–2–314(2). Under this definition, "if the product conforms to the quality of other brands on the market, it will normally be merchantable." White & Summers, at 353. Moreover, a product may fall "considerably short of perfection," and yet be merchantable. *Id.*

▄▄▄ Notwithstanding the complexity involved in determining merchantability, especially under the many various theories of causation propounded by the parties in this case, the plaintiff has marshaled no direct evidence of any inherent flaw or defect within the damaged strand. The plaintiff, in fact, never performed any tests on the broken strand: physical, chemical or metallurgical. No evidence, therefore, challenges the defendant's test [results] that the broken strand contained no intrinsic weakness or deficiency. *See* Findings of Fact, at 29. Nor has the plaintiff compared the damaged strand to other bridge strand manufactured in the market or produced a survey of bridge strand used throughout the industry to illustrate whether the strand at issue here was indeed fit for its ordinary purposes.

These omissions of the plaintiff prove particularly fatal in light of the Court's findings concerning causation of the damage to the bridge strand. The sole, credible, proximate cause of damage to the strand was the defective design of the plaintiff's cable guide system as explained above, at 26–32. This design, totally extrinsic to the strand itself, caused the damage. With these considerations in mind, the Court finds that, the plaintiff has failed to prove either that the strand was non-merchantable or that the allegedly non-merchantable strand caused the damage at bar. Thus, even assuming *arguendo* that the implied warranty of merchantability withstood Bethlehem's attempts to exclude said warranty from the contract of sale, the Court finds that the plaintiff could not prove a prima facie case of breach of warranty.[13]

### C. *Standard's Claim Under Liberty's All Risk Policy*

The Court will now address the plaintiff's claims against its insurer, the defendant in Civil Action No. H–78–127, Liberty Mutual Insurance Company. Paragraph 6 of the plaintiff's complaint against Liberty alleges that Standard was in the process of lowering an approximately 360 ton section of the old bridge when a strong wind suddenly arose. This wind purportedly forced the barges on which the derricks were

---

**13.** The Court notes that the same findings concerning causation would prevent the plaintiff from proving that an implied warranty of fitness for a particular purpose had been breached, if the plaintiff could prove that such a warranty had been created in this case. Moreover, regarding both warranties, and proof of their breach, it is significant that Bachta expressly requested bridge strand, and not wire rope, to replace the damaged strand and that said strand performed without a problem after the diameter of the arc was increased.

based to move in a circular motion. As a result of the force of the wind on the bridge section being lowered, two of the horizontal positioning cables allegedly broke causing the barges to drift downstream, so that the derricks crashed into the bridge superstructure. This purportedly caused damage to the jacking system and the electrical system.

Paragraph 10 of the complaint against Liberty alleges that, on May 23, 1974 some of the cable wires broke while a span of the bridge was being lowered, causing two of the lifting cables to become jammed. This jamming required that they be hand-fed through the grippers. The plaintiff alleged that the entire damage and loss resulted and flowed from the incidents of May 15, 1974.

In response, Liberty has interposed several special defenses. In its answer, Liberty claimed that the injuries suffered were excepted from coverage under policy exclusions for "latent defects or defective design." In its trial brief, without benefit of a formally amended answer, Liberty has metamorphosed the exclusions relied upon to include "mechanical breakdown, latent defects and inherent vice." Moreover, the insurance company alleges that the plaintiff failed to provide proper notice to the company or to cooperate reasonably with the company, both in violation of policy provisions.[14]

In addition, Liberty claims that the CONTRACTORS' ALL RISK policy covers only "direct physical loss from any external cause." Liberty argues (1) that these words of limitation, "external cause," should require that the insurance contract be construed as something less than an "all risk" policy, and (2) that the damage was not brought about by an external cause.

The Court finds that the alleged losses are included within the policy's general coverage and were not excepted by any of the relevant exclusions. Liberty, therefore, must indemnify Standard for the damage suffered. As the trial was bifurcated and tried to the Court on the issue of liability only, the amount of damages owed remains to be determined.

While dismantling the bridge, Standard was insured under two policies issued by Liberty. The first was an all-risk Contractors' Equipment Floater (Ocean Marine) policy. This policy covered the movable equipment of the insured. The risks and premiums on this policy fluctuated and changed from time to time according to the value of the equipment on the job on any specific date. Much of the major equipment on the job, such as derricks, barges and cranes, was on lease agreement from third-party owners, including the lifting cable. (Defendant's Exhibit 6). The other policy was classified as an "all risks" Installation Form. This latter policy insured the steel for the new bridge while the material was in transit, while it awaited installation, during the installation and until the work had been completed.[15] It is important to note that the exclusions in the two policies were not the same.

The CONTRACTORS' EQUIPMENT FORM policy stated in relevant part:

"THIS POLICY INSURES AGAINST

All risks of direct physical loss or damage to the insured property from any external cause, except as hereinafter provided."

Paragraph 4(g) stated the salient exceptions to coverage, as follows:

"THIS POLICY DOES NOT INSURE AGAINST:

**14.** Although the defendant originally spoke of "policies" in its answer, it is clear at this stage of the proceedings that all parties agree that the CONTRACTORS' EQUIPMENT FORM policy, and not the INSTALLATION RISKS FORM policy governs the facts at hand. *See* nn. 1, 7 *supra.*

**15.** Liberty's reliance upon *Hardware Dealers Mutual Ins. Co. v. Berglund,* 393 S.W.2d 309, 311 (Tex.1965) for the proposition that some courts,

even in all risk cases, leave the burden of proving that a "claimed loss was not attributable to the pleaded exclusion rested on the insured" is unfounded. *Dow Chemical,* a Fifth Circuit case interpreting Texas law, acknowledges that the Texas rule as articulated in *Berglund* is directly opposed to the "usual 'all risk' [burden of proof] rule," as cited in the body of this opinion. *Dow Chemical, supra,* at 386, n. 8.

....

(g) Loss or damage due and confined to wear and tear, mechanical breakdown, inherent vice, latent defect, gradual deterioration or depreciation, insects or vermin."

By contrast, the Installation Risks Policy contains a specific "designed defect" exclusion, which affirmatively disclaims loss or damage resulting from *"error or miscalculation in the design for or performance of* the installation or work in respect to the new bridge construction, unless fire or explosion ... ensues." (Emphasis added). Thus, there is no "design defect" exclusion in the CONTRACTORS' EQUIPMENT FORM (All Risk) policy.

Standard's complaint, on its face, claims recovery under both insurance policies. However, in Standard's counsel's final argument to the Court, he clearly distinguished the Contractors' Equipment policy when he stated, "a *special defense* was filed by the Defendant, Liberty, relying upon the *design exclusion* exception." (Emphasis added) (Tr. 3, November 14, 1983). It was in the other policy, namely, the Installation (All-Risk) policy; it was not in the Contractors' Equipment policy. Thus, under the Contractors' Equipment policy, the policy under which the plaintiff actually proceeded and which covers the damage at hand, no design defect exclusion is applicable. (*See* Tr. 19, November 14, 1983).

 As mentioned previously, Liberty contends that the "external cause" requirement for coverage renders this policy something less than an "all" risk policy. Notwithstanding this contention, the Court finds that this policy should be construed as an all risk policy. Similar policy language has been interpreted by the Second Circuit recently as signalling all risk coverage. *Atlantic Lines Limited v. American Motorists Insurance Co.,* 547 F.2d 11, 12 (2d Cir.1976) holds:

"The policy issued by appellee insured for 'physical loss or damage to the property insured from any external cause', except for certain exclusions which are not pertinent to the issues herein, and was correctly construed by the District Judge to be an 'all risks' policy."

*See also Dow Chemical Co. v. Royal Indemnity Co.,* 635 F.2d 379, 385–86 (5th Cir.1981), *rehearing denied* (1981); *Holiday Inns Inc. v. Aetna Ins. Co.,* 571 F.Supp. 1460 (S.D.N.Y.1983); *Dickson v. U.S. Fidelity and Guaranty Co.,* 77 Wash.2d 785, 466 P.2d 515, 517–19 (1970) (en banc); *Kraemer Bros., Inc. v. U.S. Fire Insurance Co.,* 89 Wis.2d 555, 278 N.W.2d 857, 860–61 (1979); *Raybestos Manhattan, Inc. v. Industrial Risk Insurers,* 289 Pa.Super. 479, 433 A.2d 906, 908 (1980). *But see Contractors Realty Co., Inc. v. Insurance Co. of North America,* 469 F.Supp. 1287, 1292 (S.D.N.Y.1979) (ignoring *Atlantic Lines, supra,* and failing to consider at all the differences between all risk and specific risk policies) and *N-Ren Corp. v. American Home Assurance Co.,* 619 F.2d 784, 787–88 (expressly following *Contractors Realty, supra* ). This finding makes particular sense in light of the Court's conclusion, *infra,* that every all risk policy contains an implicit requirement of external causation.

 In construing this all-risk policy, as in construing any such insurance policies, the Court must read it as a "layman, rather than an experienced underwriter, would." If the Court makes a finding of ambiguity, it should consider the "reasonable exceptions of the insured," if such exceptions are " 'objectively reasonable from a layman's point of view.' " And when, as here, an insurer drafts special exclusions from coverage, the " 'burden is on the insurer to prove that exception to the insurance contract.' " *Jurrius v. Maccabees Mutual Life Ins. Co.,* 587 F.Supp. 1301, 1304–5 (D.Conn.1984); and *Holiday Inns Inc. v. Aetna Ins. Co., supra.*

No Connecticut Supreme Court decision has been found which discusses in detail an all risk insurance policy. Under such circumstances, the Second Circuit has decreed that the federal court must predict how the highest state court would rule by considering "all the data the highest court of the

state would use." *Roginsky v. Richardson-Merrell, Inc.*, 378 F.2d 832, 851 (2d Cir.1967) (*per curiam decision on rehearing*). The Court therefore has considered a broadly-based perspective of "all risk" cases, which most accurately reflect the conceptual underpinnings of such policies.

The label "all risk" is essentially a "'misnomer.'" *Essex House v. St. Paul Fire & Marine Ins. Co.*, 404 F.Supp. 978, 987 (S.D.Ohio 1975) (*citation omitted*). All risk policies are not "all loss" policies; all risk policies, including the policy at issue here, contain express written exclusions and implied exceptions which have been developed by the courts over the years. *Avis v. Hartford Fire Ins. Co.*, 283 N.C. 142, 195 S.E.2d 545, 547–50. However, the language of all risk policies is not to be given a restrictive meaning. *Fidelity So. Fire Ins. Co. v. Crow*, 390 S.W.2d 788, 798 (Tex.Civ.App.1965) *rehearing denied* (1965); *Bryant v. Continental Ins. Co.*, 2 Wash.App. 37, 466 P.2d 201, 202 (1970); *Compagnie des Bauxites de Guinee v. Insurance Co. of North America*, 554 F.Supp. 1075, 1078 (W.D.Pa.1983) ("*Compagnie des Bauxites I*"). In a nutshell, "[a] policy of insurance insuring against 'all-risks' is to be considered as creating a special type of insurance extending to risks not usually contemplated, and recovery will usually be allowed, at least for all losses of a fortuitous nature, in the absence of fraud or other intentional misconduct of the insured, unless the policy contains a specific provision expressly excluding the loss from coverage." Annot. 88 A.L.R.2d 1122, 1125, "Coverage Under 'All Risks' Insurance" (1963).

*See also Avis, supra*, 195 S.E.2d at 547; *Dow Chemical, supra*, at 386 (1981); *C.H. Leavell & Co. v. Firemen's Fund Ins. Co.*, 372 F.2d 784, 787 (9th Cir.1967), *rehearing denied* (1967).

The North Carolina Supreme Court when considering both the origins and currently-understood purposes of all risk policies, has further dissected this general statement into four specific elements or requirements.

An insurer shall extend coverage when these following four conditions are met: "(1) The loss must be fortuitous ... (2) The loss must not result wholly from an inherent quality or defect in the subject matter ... [it] must result from at least one extraneous cause ... (3) The loss or damage must not result from the intentional misconduct or fraud of the insured ... [and] (4) The risk must be lawful." *Avis, supra*, 195 S.E.2d at 549.

This four-pronged *Avis* test reflects a deeply-rooted public policy that, regardless of the parties' contractual agreement, insurance should only cover losses resulting from a casualty. *Compagnie des Bauxites de Guinee v. Insurance Co. of North America*, 554 F.Supp. 1080, 1083–85 (W.D.Pa.1983), *rev'd on other grounds*, 724 F.2d 369 (3rd Cir.1983). ("*Compagnie des Bauxites II*"), and 566 F.Supp. 258, 260–61 (W.D.Pa.1983) ("*Compagnie des Bauxites III*"). *See also* Annot. 88 A.L.R.2d at 1127–28. There is no casualty unless some risk is involved. *Id.* at 261; *Avis, supra*, 195 S.E.2d at 547–48. Damage which is certain and inevitable and which either (1) proceeds from an inherent vice or infirmity present at the time that the policy was issued as a veritable time-bomb, already set and ticking, as demonstrated in *Greene v. Cheetham*, 293 F.2d 933, 936–37 (2d Cir.1961); *Avis, supra; 80 Broad St. Co. v. U.S. Fire Insurance Co.*, 88 Misc.2d 706, 389 N.Y.S.2d 214, 215 (Supr.Ct.1975), or (2) is the natural, expected result of normal wear and tear or deterioration, *Avis, supra*, 195 S.E.2d at 547, is not the result of a casualty and cannot be covered. Thus, the requirements of a fortuitous or accidental event, *id.*, 195 S.E.2d at 548, and of an external, rather than an internal or inherent cause work together to guarantee that no loss may be insured against unless it arises from a sudden, accidental and unexpected source. *Compagnie des Bauxites III, supra; Kraemer Bros., supra*, 278 N.W.2d at 861.

Courts have viewed the close cooperation between the fortuitousness and the external, or extraneous cause requirements in

such a manner as to present the two requirements as a sort of partnership. *Id., Compagnie des Bauxites III, supra,* at 261–62. *See also General American Transportation Corp. v. Sun Ins. Offices, Ltd.,* 239 F.Supp. 844, 846 (E.D.Tenn.1965); *aff'd* 369 F.2d 906 (6th Cir.1966); *Avis, supra,* 195 S.E.2d at 547–49 for examples of fortuitousness being used interchangeably or in close connection with external or extraneous causation.

▮▮▮▮ As such, an all risk policy covers only losses caused by "fortuitous and extraneous" events. *Compagnie des Bauxites III, supra,* at 261–62, includes as part of its fortuitous requirement, a further requirement that the cause of harm be an "extraneous force" emanating "from without" and teaches that cases in which "external causes intervened" satisfied the fortuitousness requirement for coverage. Thus, every all-risk policy includes, as part of its fortuitousness requirement, an implicit requirement of external cause.

▮▮▮▮ In satisfying their respective burdens of proof, certain advantages accrue to "all-risk" plaintiffs. Keeton, *Insurance Law,* § 5.1(b)(1), at 270 (1971). Unlike specific risk insureds, who must prove that the "loss was due to a peril falling within the policy's coverage," *Redna Marine Corp. v. Poland,* 46 F.R.D. 81, 86 (S.D.N.Y.1969) the all risk insured has generally met his burden of proof by establishing, using the four elements just cited, "a fortuitous loss within the comprehensive coverage though not proving exactly what caused it." Keeton, *supra,* at § 5.1(b)(2), at 271. *See also Atlantic Lines, supra,* at 12–13.

▮▮▮▮ Once the plaintiff has discharged this burden, the burden then shifts to the defendant to "prove that the loss arose from a cause which is excepted." Annot., 88 A.L.R.2d 1122, *supra,* at 1130. *See also Redna, supra.* This rule is consistent with the Connecticut rule requiring

insurers to prove exclusions they claim, *Jurrius, supra,* at 1306, and with the federal procedural rule obligating defendants to prove their affirmative defenses, in this case, policy exclusions. *Contractors Realty, supra,* at 1293.[16]

As the Court has explained, its task is twofold. It must determine (1) whether Standard has proven under the *Avis* test "a fortuitous loss within the comprehensive coverage," and if so, (2) whether Liberty has proven that a specific exclusionary clause has precluded coverage.

1. *Standard Suffered a Fortuitous Loss Within the CONTRACTORS' EQUIPMENT FORM (All Risk) Policy.*

▮▮▮ Using the four-pronged *Avis* test, Standard must show, within the "all risks ... from any external cause" language of the CONTRACTORS' EQUIPMENT FORM (All Risk) Policy, (1) that, a fortuitous loss took place, (2) not arising from an inherent quality or defect in the subject matter, but occurring as a result of at least one extraneous or external cause, (3) that there was no fraud or intentional misconduct on its part, and (4) that the risk insured was a lawful one. No material controversy exists concerning elements (3) and (4). The plaintiff has easily satisfied these requirements. However, the Court must carefully apply the judicial constructions of fortuitousness and external cause to the Court's findings of causation here to decide whether, under these facts, the plaintiff has presented a prima facie case. The Court acknowledges the interrelationship and overlap between fortuitousness and external cause, revealed in, *inter alia, Kraemer Bros., Compagnie des Bauxites III, Avis* and *General American, supra.* As a result, the Court shall, after examining the definitions of each of these two requirements individually, apply the findings of causation to both at one time to decide if a "fortuitous and extraneous" loss has taken place here.

---

**16.** The Court rejects the *Contractors Realty* and *N-Ren, supra,* definition of external cause because, as previously mentioned, these cases fail to consider the special nature of all risk policies, or to distinguish all risk policies from specific risk policies.

A fortuitous event is one which occurs accidently, as a layman, and not a technician or scientist would understand that term. *Avis, supra,* 195 S.E.2d at 548, citing *Finkelstein v. Central Mutual Ins. Co.,* 8 Misc.2d 261, 166 N.Y.S.2d 989. It is an event "which happens by chance ..., unexpectedly or without known cause, [one which is] undesigned[,]" or unplanned. *Compagnie des Bauxites III, supra,* at 260–61. An event which is certain to take place or is inevitable cannot be fortuitous, *Millers Mutual Fire Ins. Co. v. Murrell,* 362 S.W.2d 868, 870 (Tex.Civ.App.1962), *Essex House, supra,* at 987–90, but a court must exercise restraint in its determination of whether an event was inevitable. *Id.,* at 990; *Millers Mutual, supra. See also Compagnie des Bauxites II,* 724 F.2d 369. It must also gauge inevitability by standing in the shoes of the parties at the time the contract of insurance was made. "A fortuitous event ... is an event which so far as the parties to the contract are aware, is dependent upon chance." *Essex House, supra,* at 989; *Texas Eastern Transmission Corp. v. Marine Office-Appleton & Cox Corp.,* 579 F.2d 561, 564 (10th Cir.1978), both citing Restatement of Contracts, § 291, comment (a) (1932). In other words, bearing in mind the Court's narrow interpretation of insurance exceptions, including those implied by public policy, and the traditionally broad view of all risk coverage, damage is "fortuitous [if] neither party knew or contemplated that there was any defect" at the time of the issuance of the insurance contract. *Essex House, supra,* at 988–89, citing *Employers Casualty Co. v. Holm,* 393 S.W.2d 363 (Tex.Civ.App. 1965). One case proceeds to imply that at least one of the parties, presumably the one against whom the inevitability doctrine is to be used, must be certain at the time of contracting, here, the taking out of the policy, that the defect known of would cause the arguably "inevitable" damage. *Millers Mutual, supra.* And finally, a loss is not fortuitous if it is certain to happen, as a result of (1) the natural behavior of the subject matter insured, (2) an intentional act on the part of the person insured, who exposes his goods to a loss purposely, (3) ordinary wear and tear, (4) other natural deterioration, or (5) internal deficiencies which would inevitably cause damage. *Avis, supra,* 195 S.E.2d at 547–48.

External cause must be distinguished from both external damage and internal effect.

"External damage refers to the condition of a particular part of a thing which has an inside and an outside, and, specifically, the outer or exterior part thereof. External cause, on the other hand, is concerned with the outward source or origin of an instigating agent. A cause which has an external source or origin is not rendered internal by the fact that its effect is internal, since it is the means and not the injury itself to which the phrase refers." *Dubuque Fire and Marine Ins. Co. v. Caylor,* 249 F.2d 162, 164–65 (10th Cir.1957).

*See also Raybestos-Manhattan, supra,* 433 A.2d at 908. External cause can further be explained in contrast to what it is not. A cause is external if damage which arises from it does not result wholly "from an inherent defect in the subject matter or from the inherent deficient qualities, nature and properties of the subject matter," *Compagnie des Bauxites III, supra,* at 261; as the " 'consummation of an in-dwelling fault.' " *Essex House, supra,* at 991 (citation omitted).

Bearing these definitions in mind, as well as the abovementioned interplay between fortuitousness and external cause, the Court finds that the plaintiff, Standard, has proven a prima facie case. It has illustrated both that fortuitous events caused the damage at issue and that this damage arose from an external cause.

Under the terms of the all-risk policy covering the Contractors' Equipment as herein construed, it is essential that the plaintiff demonstrate that the damage caused to the cable guides and its consequent effect on the lifting cables and machinery was a fortuitous loss caused by external forces. The Court finds that the

actual cause of the cable guide's breaking off was Standard's own miscalculation in the design of the cable guides, guides that Standard itself had constructed and installed. In June of 1973, these cable guides had been originally portrayed on plans by Standard which demonstrated a 17' diameter arc. (Defendant's Exhibits 8, 9, and 10). The Court finds that this size arc was required, so that any extra length of lifting cable above and hanging over the grippers would not bend sharply and hang over the cable guide. If it did, it would create a binding effect and cause kinking of the individual wires in the cable. During the first operational pick, this narrow cable seat created excessive friction as the tremendous weight and torsion pulled on the lifting cables as soon as the full weight of the bridge section became suspended upon it.

On August 30, 1973 (Defendant's Exhibit 8) Standard sent to Elgood-Mayo Corporation several blue-print drawings (Defendant's Exhibits 8, 9, and 10), which showed an arched diameter of 25 feet. However, on May 15, 1974, when the first lift was commenced, the cable guide constructed and erected by Standard, consisted of a steel I-beam welded to the derrick-boom, with a very small diameter arc seat of only two or three feet. (Brennan, Deposition Testimony, at 23).

The significance of this inadequate structure as related to the ultimate damage is confirmed by the engineering report of Teledyne Materials Research which submitted on November 19, 1974, a technical analysis and explanation of its professional findings as to the cause of the problem. (Plaintiff's Exhibit 60). The report stated, "The purpose of the cable guide is to provide the free end of the cable with a track such that it is clear from the gripper area." (Report at 4). "[T]he *design* of the cable guide is insufficient for the combination of dead weight and frictional forces." (Emphasis added) (Report at 6).

In explaining the individual wires of the cable going out of lay and being permanently damaged, the report said,

"The second probable cause of the overlap would be due to the cable passing over the sharp radius of the cable guide. It is quite conceivable that a sharp kink could cause the lay to spread apart and upon straightening, a tangle would occur because of the open lay." (Report at 8). "The damage which occurred to the cable guides was, undoubtedly, due to the fractured wires becoming caught, thus, twisting the guide." (Report at 9).

The type of fracture exhibited by the wires, clearly shows that a compressive action helped to create a tensile force and precipitated the fracture. The foregoing conclusions explain clearly why the kinked individual wires went out of lay in the lifting cable. These wires were crushed and broken off in the grippers, when the full weight of the bridge section was lifted and suspended.

The Court finds that the damage to both the northeast cable guide and to the southwest cable guide, as well as to the lifting cable contained therein, was caused by Standard's error or miscalculation in creating a faulty design in the construction and erection of the cable guides. Such errors in miscalculation and design were not known to the plaintiff at the critical time, the time when the policy was actually issued. This design defect was a fortuitous loss, flowing from an external cause. As explained previously, the defendant had mistakenly alleged in its third affirmative defense that "defective design" was specifically excluded under the policy of coverage; this, however, was not true concerning the Contractors' Equipment policy.

The primary causative defect here flowed from the negligence in constructing the cable guides contrary to the engineering specifications and blueprints. (Defendant's Exhibits 8, 9, and 10). Had the arc of the guides been constructed with a 17-foot diameter or a 25-foot diameter, as the plans called for, no accident and resulting damage would have occurred. As subsequently demonstrated, even a 10-foot diameter arc proved to be successfully operable.

The aforesaid negligent construction, in failing to follow the engineering specifications, by the plaintiff's agents and employees became a part of the insured property risk. The causative agent of damage resulting from this design defect did not emanate from an inherent vice within the property itself, but from without. It came from negligently failing to follow the engineering specifications. An apt analogy from *Essex House, supra,* illustrates this point. *Essex House* distinguished the damage created by negligent design and workmanship in adding brick work to an apartment house from that resulting from sources within, namely, a contaminant which had already spoiled fish and caused decay to be existing at the time they were first insured and later shipped, *Greene, supra*; and similar in causal effect to an inherent stone defect which caused an opal to crack, *Chute v. Northern River Ins. Co.,* 172 Minn. 13, 214 N.W. 473 (1972), in this fashion.

"Both *Greene* and *Chute* appear at first glance to provide strong support for the defendant in our case. However, both are distinguishable on the ground that in both cases the loss was brought about by a nonobservable flaw in the insured goods. As such the cases are not analogous and do not compel a denial of recovery for the Essex House loss. A more appropriate analogy would be between, say, the *bricks* of Essex House and the fish and gem in *Greene* and *Chute.* Surely the respective insurance companies would not have written the policies if the fish were observed to have green mould on their gills or the opal was visibly cracked. These would operate as signals to a potential insurer that something was wrong with the goods. In our case the window placement and noticeable lack of headers would amount to the same sort of red flag. Had the header bricks been found to contain too much sand, for example, and were thus inherently weak, *Greene* and *Chute* would be more persuasive. But no evidence whatsoever was introduced to show that the headers—or any other

component of the Essex House—broke because of the 'consummation of an indwelling fault.' Unlike the fish and the opal, the bricks did not carry within themselves the seeds of their own destruction." *Essex House, supra,* at 991.

The bricks of *Essex House* are analogous to the cable guides and the bridge strand cable in this case. There was nothing inherently defective about either the bridge strand cable, (*see* §§ A and B.3 of the Conclusions of Law, *supra*) or the cable guides themselves. Both were manufactured properly. Neither carried "within [itself] the seeds of [its] own destruction." Only when the external instigating agent, observable in the engineering plans and blueprints, the design defect, deployed the strand and guides with an insufficient arc to the strand's diameter did the resulting friction damage ensue. Thus, the Court finds the design defect to have been an external cause of this damage.

The plaintiff has proven its prima facie case concerning the "second accident." The loss therein suffered was fortuitous. The breaking of the positioning cables happened by chance and was clearly an accident in the layman's understanding of that term. It makes no difference that the plaintiff has failed to prove its original contention that a "big wind" caused the barges to move and the positioning cable to snap. As long as the loss was fortuitous and otherwise within the "all risk" coverage, the plaintiff does not have to prove exactly what caused the loss. *See cases collected at* 61, *supra.* Moreover, the breaking of the positioning cables was from an external cause. The damage arising from the second accident resulted from an outward source—the breaking of the positioning cables—and was therefore extraneously caused. This would be true, whether caused by the rise and/or fall of the tide, the natural current of the river, or the breaking of the cable guides.

The incidents causing this damage were fortuitous. The precipitating forces here, the falling of the northeast cable guide and twisting of the southwest cable guide were

accidents as a layman would understand that term. This particular jacking system had never before been employed using this special kind of bridge strand cable in this unique method of lifting operation and the resulting damage was not certain or inevitable. Although Taylor, the iron erection superintendent had warned Bachta about the possibility of deleterious consequences of such a small diameter of cable guide, a short time prior to the lift, neither contracting party knew of and recognized the seriousness of the problem at the significant and controlling time, namely, at the time of the issuance of the insurance policy, October 1, 1973. In brief, a loss caused by "an unknown design defect is one caused by a fortuitous event." *Compagnie des Bauxites, II*, 724 F.2d 369, 373 (3rd Cir.1983). Thus, the events causing the damage were fortuitousness and external causation by the use of a design defect.

### 2. *Liberty Mutual Has Failed to Prove That Policy Exclusions Apply in This Case*

Liberty originally pleaded policy exclusions for "latent defects or defective design" as special defenses precluding coverage. Later, in all post-trial memoranda, and without formally amending its answer, Liberty sought to rely upon exclusions for "mechanical breakdown, latent defect, and inherent vice." As a result, the plaintiff claims that the defenses of mechanic breakdown and inherent vice were never properly presented to the Court and should not be considered. Assuming, without deciding, that all the exclusions relied upon have been properly presented for the Court's consideration, the Court finds that the defendant Liberty failed to prove that these exclusions should abnegate coverage. The Court will examine each of these exclusions separately.

### a. *Defective Design*

Liberty appears to have abandoned the defense of defective design, as nowhere in its post-trial memoranda does the insurer rely upon that defense. As previously mentioned, there was no exclusion for defective design included in the CONTRACTORS' EQUIPMENT FORM policy, the policy which provided coverage for the instant losses.

In comparison, the second policy, the one not applicable here, the INSTALLATION RISKS FORM policy, expressly excludes "loss or damage resulting ... from error or miscalculation in the design for ... the installation or work," § 4(g); however, the CONTRACTORS' EQUIPMENT FORM policy, the policy at issue in the instant case, includes no such provision. Thus, it becomes clearly apparent that the defective design exclusion should not be applied in this case. The strongest argument for not allowing any of the other exclusions relied upon by the insurer to apply is that (1) Liberty demonstrated that it could certainly have written such a phrase excluding an inherent design defect when it wanted to (one which, in fact, differentiated between exclusions for defective design and those for mechanical breakdown, inherent vice and latent defect; *cf.* §§ 4(c) and 4(g) of the INSTALLATION RISKS FORM policy, and (2) it chose not to do so in the CONTRACTORS' EQUIPMENT FORM policy, the one which the Court is now called upon to interpret and apply.

### b. *Latent Defect*

" 'A latent defect is one that could not be determined by any known and customary test.' " *General American, supra*, 239 F.Supp. at 846, *citing General Motors Corp. v. The Olancho*, 115 F.Supp. 107, 118 (D.N.Y.1953), *aff'd* 220 F.2d 278 (2d Cir. 1955). Liberty has presented no credible evidence that the design defect here could not have been discovered through the use of normal stress calculations. *Plaza Equities Corp. v. Aetna Casualty and Surety Co.*, 372 F.Supp. 1325, 1331 (S.D.N.Y.1974). Thus, this exclusion is not a latent defect and does not apply.

### C. *Mechanical Breakdown*

A mechanical breakdown is defined as follows:

"We interpret a mechanical breakdown here to have reference to a fault in the

working mechanism of the machinery—a functional defect in the moving parts of the equipment which cause the latter to cease functioning or to function improperly." *National Investors Fire & Casualty Company v. Preddy,* 248 Ark. 320, 451 S.W.2d 457 (1970).

*See also Connie's Construction Co., Inc. v. Continental Western Ins. Co.,* 227 N.W.2d 204, 207 (Iowa 1975). The Court has found the cause of the damage here to have nothing to do with "functional defect[s] in the moving parts" of the lifting system. The cable guide failure was not in itself a working mechanism, as such, but a solid stationary steel I-beam structure, which had been welded to the derrick and used to perform a passive auxiliary function, namely, to guide and stabilize the excess lifting cable, both before and after it had passed through the grippers. Thus, it is apparent that no "mechanical breakdown" as such, occurred to cause this accident. Therefore, this exclusion does not preclude coverage.

### d. *Inherent Vice*

Inherent vice is an exclusion which applies to losses from natural decay, "ordinary wear and tear and inevitable depreciation." Keeton, *supra,* § 5.3(c), at 282. The damage in this case was not the normal result of ordinary wear and tear or the expected decay of a product when exposed to natural conditions, which would generally bring about such decay, i.e. the rusting of patio furniture left out in the rain for several years, or the natural deterioration of unfinished wood when exposed to the elements over a period of time. Rather, it was a loss arising from a combination of sudden, accidental and fortuitous events. Therefore, this exception does not disallow coverage in such an all-risk policy.

3. *Liberty Mutual Has Failed to Prove That Standard's Notice or Cooperation Were Either Unreasonable or Substantial or Adversely Affected Liberty Mutual's Interests.*

Liberty Mutual claimed as special defenses that Standard sent late notice to and failed to cooperate properly with Liberty in its investigation, in contravention of the policy provisions. The Court will deal with these contentions in a summary manner. Neither under the traditional Connecticut test requiring reasonable notice or the emerging Connecticut test obligating the insurer to demonstrate that it suffered prejudice as a result of the insured's late notice, has Liberty proved its special defense of improper notice. *Zieba v. Middlesex Mutual Assurance Co.,* 9 C.L.T. No. 6, at 9, 11–12 (D.Conn. February 7, 1983). Under Connecticut law, the purpose of the "cooperation" clause is "to protect the interest of the insurer, and any conduct of an assured, to constitute a breach of it, must have adversely affected its interest in some substantial and material way." *Rochon v. Preferred Accident Insurance Co.,* 118 Conn. 190, 197–98, 171 A. 429 (1934). Under this standard, Liberty has failed to prove its defense of lack of cooperation. If the Court was to find that the plaintiff had the burden of proving cooperation under *O'Leary v. Lumbermen's Mutual Casualty Co.,* 178 Conn. 32, 38, 420 A.2d 888 (1979), the Court would so find that the plaintiff had proven reasonable cooperation.

### Conclusion

The plaintiff, Standard, has proven that coverage exists and that Liberty has failed to prove that any exclusions abnegate its duty to extend coverage. This Court finds Liberty liable to indemnify Standard for the provable damage referred to above. Due to the bifurcation of the trial, the exact amount of damages is reserved to be determined at a supplemental hearing.

The foregoing opinion shall constitute the Court's findings of fact and conclusions of law under Rule 52(a), Fed.R.Civ.P., on the issues of liability.

SO ORDERED.